# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES J. BINNS, ESQ., | : | |
| as sole shareholder of | : | |
| JAMES J. BINNS, P.C., | : | |
| Plaintiff, | : | |
| | : | Civil Action |
| v. | : | No. 18-1166 |
| | : | |
| BB&T BANK | : | |
| Defendant. | : | |

**MCHUGH, J.** May 6, 2019

## MEMORANDUM

Plaintiff James J. Binns, Esq., as sole shareholder of James J. Binns, P.C., brought this action against Defendant BB&T Bank under § 3406 of the Uniform Commercial Code (UCC) for the recovery of unauthorized electronic transactions withdrawn from his account. BB&T has moved for Summary Judgment on Mr. Binns's claim, relying on defenses provided by the UCC as well as those found in the Banking Agreements that governed the use of the account. There is a surprising lack of precedent as to what law applies to transactions of this kind. I conclude that the UCC provisions cited by the Plaintiff are inapplicable to the electronic transactions at issue, which are instead controlled by the Banking Agreements. Under those Agreements, Mr. Binns was obligated to review his statements and notify BB&T of any questionable transactions. Because he did not provide such notice and does not dispute that all of the transactions at issue were accurately set forth in statements that he admits receiving, BB&T is entitled to summary judgment.

**I.     FACTUAL RECORD**

This action concerns 267 unauthorized transactions from Mr. Binns's account that occurred between January 2013 and March 2017.[1]  The account in question was a "Business Checking" account Mr. Binns opened with National Penn Bank, entitled "James J Binns P.C. Operating Account" and ending in the digits -6872.  *See* Def.'s Mot. Summ. J. Ex. D, ECF No. 38-7.  While the account was held by National Penn, it was subject to an account holder agreement referred to as a "Personal and Business Deposit and Electronic Banking Services Agreement and Disclosure."  Def.'s Mot. Summ. J. Ex. A, ECF No. 38-4 [hereinafter National Penn Agreement].  On April 1, 2016, BB&T acquired National Penn and on July 18, 2016, converted Mr. Binns's account into a BB&T "Business Value" account with a new account number ending in -1199.  *See* Def.'s Mot. Summ. J. Ex. D.  After the conversion, the account was then subject to a BB&T "Commercial Bank Services Agreement."  Def.'s Mot. Summ. J. Ex. B, ECF No. 38-5 [hereinafter BB&T Agreement].

Mr. Binns used the account primarily for his Professional Corporation:  "[i]t's the business account.  That's where the money I receive gets deposited into and out of which I write checks."  Def.'s Mot. Summ. J. Ex. G 22:12-16, ECF No. 38-10 [hereinafter Binns Dep.].  Mr. Binns also used the account for personal expenses "[p]erhaps on occasion."  Binns Dep. 22:17-19.  National Penn, and later BB&T, sent Mr. Binns monthly statements containing the transactions made on the account, which he himself would open and review upon receipt, usually

---

[1] The Court has relied on the spreadsheet provided in Defendant's Exhibit C, ECF No. 38-6, to identify the nature and timing of the transactions.  Plaintiff has not disputed the accuracy of this exhibit, or any other exhibit submitted with Defendant's Motion.

2

looking at each charge.  Mr. Binns has admitted, however, that he did not, nor did any of his employees, ever reconcile the statements with his checkbook.

The transactions in question were made by Mr. Binns's daughter, Amy Ives Binns, between January 2013 and March 2017, when Mr. Binns finally closed the account.  The transactions were electronic "ACH" transactions, made without the need of a signature, using Mr. Binns's account and routing numbers.  Mr. Binns noticed the first unauthorized transaction, made on January 11, 2013, when it appeared in his January 31, 2013 statement without an accompanying check number.

Shortly thereafter, Mr. Binns placed a call to BB&T employee Shaquana Moss, his regular contact at the bank, to ask why there were withdrawals on his statement without check numbers.  Ms. Moss explained that the check number no longer appears on a statement when a written check is converted into an electronic withdrawal.  Mr. Binns then asked whether there was anything unusual about these transactions, and Ms. Moss assured him that they were normal and happened often.  Mr. Binns did not believe he had performed those electronic transactions.  Significantly, however, when asked at his deposition whether he told Ms. Moss about this suspicion during the phone call, he responded, "[n]o. I didn't tell her that."  Binns Dep. 33:3-5.

Mr. Binns made an additional phone call to Ms. Moss in "winter 2017" where he questioned a transaction made to a utility company.  Def.'s Mot. Summ. J. Ex. I 82:22-24 [hereinafter Moss Dep.].  In response, Ms. Moss asked whether he had a bill from the company, but Mr. Binns did not know and did not press the issue further, then or in any subsequent call.

Sometime during the winter of 2017, Mr. Binns had a conversation with another BB&T employee, Latifah Brooker, who informed him that his daughter had been making in-person withdrawals from his account.  Mr. Binns testified "[t]hat is when I started to go over the

3

accounts with Ms. Moss and say, [y]ou've got to undo this money that she's drawing out." Binns Dep. 34:24-35:2. Ms. Moss informed Mr. Binns he needed to complete an affidavit to identify any unauthorized transactions. Mr. Binns subsequently completed affidavits on February 10, 2017, February 15, 2017, and April 12, 2017, which identified 24 unauthorized transactions dating back to October 3, 2016. In response, BB&T reimbursed 23 out of the 24 transactions identified in the affidavits. In his deposition, Mr. Binns admitted that the affidavits represented the first time he had expressed to Ms. Moss his belief that there were unauthorized transactions made from the account. Mr. Binns then initiated the present action in the Philadelphia Court of Common Pleas on September 12, 2017 in attempt to recover additional unauthorized transactions. On August 5, 2018, during discovery, Mr. Binns identified the 243 additional transactions that add up to the 267 unauthorized transactions that form the basis of his claim.

## II. LEGAL STANDARD

This motion is governed by the well-established standards of Fed. R. Civ. P. 56, as amplified by *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n.3 (1986). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party and a factual dispute is "material" only if it might affect the outcome under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III. DISCUSSION

A threshold issue in determining this Motion is what law applies to electronic ACH transactions made from a business bank account. Plaintiff brought this case pursuant to Article 3 of the Pennsylvania Uniform Commercial Code (UCC). 13 Pa. Cons. Stat. §§ 3101-3122. Defendant responded in kind with bank defenses available under Article 4. 13 Pa. Cons. Stat. §§

4101-4111. The Court's research suggested that the Electronic Fund Transfer Act (EFTA), 15 U.S.C. § 1693 *et seq.*, might apply, but after supplemental briefing I am persuaded by the bank's argument that EFTA does not apply to business accounts. But the provisions of the UCC cited by the parties do not apply either, as those provisions apply only to traditional written instruments, such as checks.[2] Consequently, the Banking Agreements control in deciding this dispute. The basis for this conclusion follows.

A. <u>Application of the UCC</u>

During a telephonic hearing before the Court, Mr. Binns represented that the single count set forth in his Complaint was brought under Article 3 of the UCC, which governs negotiable instruments. 13 Pa. Cons. Stat. § 3102(a). Specifically, Mr. Binns's claim is brought under § 3406, which allocates loss from a forged signature or alteration on an instrument according to the exercise of ordinary care. 13 Pa. Cons. Stat § 3406(b). The litigation has focused on this § 3406 claim, including all subsequent discovery and BB&T's present Motion for Summary Judgment, which relies in large part on defenses made available under Article 4.[3] Article 4 of the UCC governs bank deposits and collections. 13 Pa. Cons. Stat. § 4101. Specifically, BB&T raises defenses under § 4406 and § 4111, which set the reporting duties, apportionment of liability, allocation of loss, and specific statutes of limitations for account holders and their banks in claims for unauthorized "items" or "signatures."

Section 4406 establishes the duty of a customer to discover and report an unauthorized signature or alteration of an item. 13 Pa. Cons. Stat. § 4406(c). An "item" is defined as an

---

[2] As discussed below, although another Article of the UCC may apply, it was not relied on by either party and, thus, did not animate the discovery or briefing before me. As a result, I rely solely on the National Penn and BB&T Banking Agreements in deciding BB&T's Motion. I note, however, that even if the UCC and EFTA did apply, they would also lead to the same result.

[3] If there is a conflict between Article 3 and Article 4, Article 4 governs. 13 Pa. Cons. Stat. § 3102(b).

"instrument or a promise or order to pay money handled by a bank for collection or payment," but the definition specifically states that "[t]he term does not include a payment order governed by Division 4A (relating to funds transfers) or a credit or debit card slip." 13 Pa. Cons. Stat. § 4104(a). Article 4 does not make any other discernable reference to electronic transactions.

BB&T points out that "[a]s briefed at length in this litigation, the transactions at issue are electronic ACH transactions which use a routing and account number *without the use of a signature*," and that "[t]he record reflects that *signature cards have nothing to do with the completion of an ACH transaction*[]." Def.'s Reply 4 n.5, ECF No. 51 (emphasis added).

I am persuaded that neither Article 3 nor Article 4 of the UCC, under which the parties have litigated, applies to the transactions at bar. This issue was addressed by my colleague, Judge Surrick, in *Hospicomm, Inc. v. Fleet Bank N.A.*, 338 F. Supp. 2d 578, 584-87 (E.D. Pa. 2004). After a thorough review, he concluded that "Pennsylvania's adoption of Article 4 does not contemplate electronic withdrawals," and that "Article 4 was meant to apply only to traditional written instruments, rather than electronic means of transferring and withdrawing funds." *Id* at 486. I agree, and therefore find that Article 4 of the UCC does not apply to the transactions at bar.

I further conclude that Article 3 also does not contemplate electronic withdrawals and does not apply. As touched on in *Hospicomm*, the UCC's definition of an instrument, the focus of Article 3, does not include an electronic transaction. *See id.* at 585. Comments to the definition of a "negotiable instrument" bolster this conclusion:

> [A]n instrument is either a 'promise,' . . . or 'order,' . . . . A promise is a *written* undertaking to pay money signed by the person undertaking to pay. An order is a *written* instruction to pay money signed by the person giving the instruction. Thus, the term 'negotiable instrument' is limited to a *signed writing* that orders or promises payment of money."

6

13 Pa. Cons. Stat. § 3104, cmt.1 (emphasis added).

Therefore, neither Articles 3 or 4 apply and the UCC does not govern this case.[4]

B. Application of EFTA

In defending against the case as formulated by the Plaintiff, BB&T sought to establish that Article 4 of the UCC applied to the transactions at bar. In its attempt to do so, BB&T cited precedent, including *Estate of Clark ex rel. Clark v. Toronto Dominion Bank*, 2013 WL 1159014 (E.D. Pa. Mar. 21, 2013), which analyzed checks under the UCC and electronic transactions under EFTA. *See Deutsch v. Wells Fargo Bank, N.A.*, 2015 WL 3833226 (E.D. Pa. June 22, 2015); *Envtl. Equip. & Serv. Co. v. Wachovia Bank, N.A.*, 741 F. Supp. 2d 705 (E.D. Pa. 2010); *McMickle v. Girard Bank*, 515 A.2d 16 (Pa. Super. Ct. 1986). Because Mr. Binns's claim involves strictly electronic transactions, the parties were directed to address the potential applicability of EFTA.

EFTA governs "any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account." 15 U.S.C. § 1693a(7). It does not prevent states from providing additional consumer protections for electronic fund transfers but preempts any state law to the extent that it is inconsistent with EFTA's provisions. 15 U.S.C. § 1693q. Therefore, even if the UCC applied, to the extent that a consumer brings a claim for an unauthorized

---

[4] It is possible that Article 4A of the UCC applies to the electronic ACH transactions. The comments to § 4A104 explain that Article 4A applies to wire transfers, which are often electronic, if they are credit (as opposed to debit) transfers. 13 Pa. Cons. Stat. § 4A104, cmt.4. However, due to limitations of the record before me, it is unclear whether any of the unauthorized transactions would be considered "credit" or "debit" transfers. Regardless, the parties waived any claims or defenses under Article 4A by failing to raise them.

Furthermore, Article 4A permits the parties to alter its terms by contract. *See* 13 Pa. Cons. Stat § 4A501(a) ("Except as otherwise provided in this Division, the rights and obligations of a party to a funds transfer may be varied by agreement of the affected party.").

7

electronic transaction, the UCC is preempted by EFTA. *Patco Const. Co. v. People's United Bank*, 684 F.3d 197, 207 n.7 (1st Cir. 2012) (noting that for electronic consumer payments, EFTA, rather than the UCC governs). In *Patco*, the First Circuit explained the relationship between EFTA and the UCC:

> By contrast [to the UCC], *consumer* payments that are made electronically, such as through direct wiring or the use of a debit card, are covered by a separate federal statute, the Electronic Fund Transfer Act (EFTA), 15 U.S.C. § 1693 *et seq.* Article 4A [of the UCC] does not apply to any funds transfer that is covered by the EFTA; the two are mutually exclusive." Me.Rev.Stat. Ann. tit. 11, § 4–1108 & cmt. The drafters of Article 4A felt that a separate framework, apart from the more consumer-focused EFTA, was needed to cover electronic transfers between commercial institutions because of the sheer volume and magnitude of such transfers.

*Id*.[5]

BB&T correctly points out that Mr. Binns's account is not a *consumer* account and thus not subject to EFTA's liability framework. Indeed, EFTA only applies to consumer accounts: the Act clearly states that its primary objective is to provide "individual *consumer* rights" and defines an "account" as a "demand deposit, savings deposit, or other asset account . . . *established primarily for personal, family, or household purposes*." 15 U.S.C. §§ 1693; 1693a (emphasis added). "Corporations or other business entities are not 'consumers' for the purposes of EFTA."[6] *Ironforge.com v. Paychex, Inc.*, 747 F. Supp. 2d 384, 402 (W.D.N.Y. 2010) (citing *Kashanchi v. Texas Commerce Med. Bank, N.A.*, 703 F.2d 936, 939-42 (5th Cir. 1983).

The account in question here is a corporate account. While Mr. Binns also used the account for personal reasons "on occasion," the title of the account on his statements is "James J

---

[5] As discussed above, Article 4A is a separate UCC section, under which the parties here have not raised any claims or defenses.

[6] In *Hospicomm*, the plaintiff sought leave to amend and assert claims under EFTA if its claims under the UCC were dismissed. Although the plaintiff there was a corporation, it does not appear that the defendant bank objected, and leave to proceed under EFTA was granted.

Binns P.C. Operating Account" and Mr. Binns testified that it was his business account. Binns Dep. 22:12-14. Therefore, the account was not established *primarily* for personal, household reasons, and I do not find Mr. Binns to be a "consumer" covered by EFTA.[7]

    C. <u>Application of the Banking Agreements</u>

Because neither the UCC nor EFTA apply to the set of transactions underlying Mr. Binns's claim, I conclude that the National Penn and BB&T Banking Agreements control.[8] The Agreements limit the ability to assert claims in various respects, including where a depositor does not notify the bank within a set timeframe following receipt of a monthly statement, where the depositor fails carefully to examine statements or safeguard account information, and where unauthorized transactions have already been reimbursed. No single provision in the Banking Agreements precludes all 267 transactions, but when considered together, the Agreements bar all of Mr. Binns's claims.

    *1. Same Wrongdoer Provision (Transactions 11-267)*

Both the National Penn and BB&T Banking Agreements contain some form of "same wrongdoer" provision. This provision limits liability for recurring unauthorized transactions by the same wrongdoer if the customer does not notify the bank within a certain time-period of the first unauthorized transaction. The "Statements" provision of the National Penn Agreement states:

---

[7] Prior to the Motion for Summary Judgment, there was a disagreement between the parties over the identity of the plaintiff when plaintiff sought to amend the complaint, specifically, whether the account holder was Mr. Binns in his personal capacity, or on behalf of his Professional Corporation. The Court acknowledged Defendant's legitimate concern that Plaintiff was seeking a tactical advantage to avoid the terms of the Banking Agreements entered into by Mr. Binns's Corporation. In an exercise of judicial economy, the Court ruled that Mr. Binns and his Corporation would be treated interchangeably for purposes of pleading only, without a change in the controlling substantive law. The account here is unmistakably a business account.

[8] Like Article 4A, both Article 4 of the UCC and EFTA allow banks and account holders to amend certain rights and remedies by agreement. *See* 13 Pa. Cons. Stat. § 4103(a); 15 U.S.C. §§ 1693l, 1693g(d).

> If you do not notify us of an error, unauthorized signature or alteration within a reasonable time (not to exceed 60 calendar days) after we send or make available to you your statement and (if applicable) accompanying items, you cannot assert any errors or unauthorized signatures or alterations by the same wrongdoer on any items paid by us after the reasonable time mentioned above elapses, but before we receive notice from you.

National Penn Agreement 397, 426-27, 493-94. The "Duty to Review Account Statement" provision of the BB&T Agreement is even more stringent: "[y]ou agree to review your account statement within thirty (30) days from the statement date. The Bank will [] not be liable for any subsequent forgeries on your account committed by the same person if you fail to report the first forgery(s) within thirty (30) days." BB&T Agreement 524, 546.

It is undisputed that all of the unauthorized transactions were made by Ms. Ives and that the first unauthorized transaction occurred on January 11, 2013. This transaction appeared on Mr. Binns's January 31, 2013 bank statement. Therefore, Mr. Binns was required to notify BB&T within, at most, 60 days of receiving the January 2013 bank statement, which would have been April 1, 2013.

Mr. Binns seeks to construe his general discussion with a BB&T employee about the electronic transactions on his statement as either notice to the bank, or a sufficient excuse for his failure to pursue further inquiries. Testimony concerning that exchange fills several pages of Mr. Binns's deposition. Binns Dep. 26-33. But the statements made by Ms. Moss as recounted in Mr. Binns's testimony were, by any objective measure, accurate.[9] It might be that Mr. Binns truly misunderstood what she was explaining. The salient point is that, during the conversation, Mr. Binns never communicated any suspicion that he had not initiated the transactions: "Q: Did you tell Ms. Moss that you didn't think you had made these transactions? A: No. I didn't tell

---

[9] As to this aspect of the case, it does not appear that Plaintiff argues Ms. Moss intended to mislead him. In any event, the record would not support such a contention.

her that. There's a time when I did." Binns Dep. 33:3-6. Mr. Binns's failure to do so until years later is fatal to his claim, even if it was the product of some lack of understanding on his part, because the Agreements unambiguously provide that the responsibility for identifying unauthorized transactions rests with the account holder.

Moreover, Mr. Binns admitted that the affidavit he filled out at a BB&T branch on February 10, 2017 was the first time he told BB&T that he thought a transaction was unauthorized: "Q: And was that the first time that you expressed to Ms. Moss that you thought these transactions were unauthorized? A: Yes, ma'am." Binns Dep. 35:10-13. The affidavits that Mr. Binns eventually submitted in February and April 2017 only identified 24 transactions made in 2016 and 2017. Ms. Moss's testimony is consistent with this notification timeframe, identifying "winter 2017" as the first time Mr. Binns arguably notified her of an unauthorized transaction. Moss Dep. 82:22-24. During that winter, Mr. Binns made the second phone call where he asked about a utility payment but could not confirm whether he had a bill from the utility. Mr. Binns argues that the timing of this second call presents a genuine issue of fact, because the account was closed in March 2017, and therefore the call could not possibly have occurred in the winter of 2017. I do not find this issue material, however, because a conversation in the "winter of 2017" could just as easily have occurred in January or February, well before the account was closed in March 2017.

What is clear from the record is that Mr. Binns did not provide notice to the bank that he believed a transaction was *unauthorized* until he completed the first affidavit on February 10, 2017. Because this notice was far beyond the 60-day deadline in the National Penn Agreement[10]

---

[10] I note that the language in the National Penn Agreement closely mirrors the language in the UCC, which does not apply to electronic transactions. However, even if the National Penn Agreement was construed to be inapplicable to the electronic transactions, the BB&T Agreement, along with its tighter deadline, would apply, as it uses more expansive language that includes "any counterfeit item." BB&T Agreement 524, 546.

11

and the 30-day timeline in the BB&T Agreement, and the unauthorized transactions were all committed by Ms. Ives, the "same wrongdoer" provisions in the Banking Agreements prohibit Mr. Binns from asserting any unauthorized transactions made by her after April 1, 2013. This bars his claims for transactions 11-267.

*2. Claim Notice Deadline (Transactions 215-252)*

The BB&T Agreement also precludes any claim for an unauthorized transaction if the account holder does not notify BB&T, in writing, within 30 days of the closing date of the earliest statement containing the transaction:

> Because you are in the best position to discover an unauthorized signature or endorsement, a missing endorsement, any alterations or any counterfeit item, you agree that, without regard to care or lack of care by either you or the Bank, **we will not be liable for paying any such item and you will be precluded from any recovery from the Bank if you have not reported in writing an unauthorized signature or endorsement, a missing endorsement, any alterations or any counterfeit item to the Bank within thirty (30) days from the closing date of the earliest statement containing those items.**

BB&T Agreement 524, 546 (emphasis original).

Mr. Binns became subject to the BB&T Agreement on July 18, 2016 by continuing to conduct transactions on the account following its conversion from National Penn to BB&T. *See* BB&T Agreement 519, 541 ("When you open an account or conduct a transaction on your account after it is opened, you are agreeing to the terms of this Agreement."). As a result, this notice requirement applied to transactions 215-267, which occurred after the BB&T Agreement took effect.

It is undisputed that Mr. Binns did not submit any written notice of an unauthorized transaction until he completed the first ACH Affidavit on February 10, 2017. However, only transactions 253-267 were identified in an affidavit within 30 days of the statement in which they appeared. Therefore, the BB&T Agreement bars any claim on transactions 215-252, for which

12

Mr. Binns either provided no notice or identified in an affidavit after the 30-day time limit had passed.

*3. Limitation to File Claim (Transactions 1-226, 234, 237-252)*

The BB&T Agreement further limits the time period within which an account holder can begin a legal proceeding against BB&T to recover unauthorized transactions. The Limitation to File Claim provision in the BB&T Agreement provides:

> You agree that no legal proceeding or action may be commenced against the Bank to recover any amounts alleged to have been improperly paid out of the account due to any unauthorized signature or endorsement, any alteration, or any other fraudulent or unauthorized transaction unless: (i) you have timely provided the written notices as required above, and (ii) such proceeding or action shall have been commenced within one year from the date the first statement containing the unauthorized transaction was made available to you. As used herein, a proceeding or action is commenced when you file suit in a court of competent jurisdiction, or if the action is subject to arbitration when you give the Bank written notice of such action. Any proceeding or action not brought within one year from the date of the first statement containing the unauthorized transaction is forever barred.

BB&T Agreement 525, 547.

As noted above, the BB&T Agreement went into effect on July 18, 2016. Mr. Binns initiated the present action by filing a summons in the Philadelphia Court of Common Pleas on September 17, 2017. Accordingly, under this provision, even if the notice requirements had been met, this action could timely address only unauthorized transactions that were reflected as of the September 31, 2016 bank statement and those that occurred thereafter. This provision therefore eliminates transactions 1 through 220 because they appeared on the August 31, 2016 statement or earlier.

The Limitation to File Claim provision further requires that account holders comply with the written notice requirement. Of the transactions not excluded by the one year limitation

13

period (transactions 221-267), it is undisputed that Mr. Binns failed to submit any written notice other than the affidavits in 2017, therefore also barring transactions 221-226, 234, and 237-252.

### *4. Failure to Exercise Duty of Care (Transactions 215-267)*

Next, the BB&T Agreement contains a Duty of Care provision, which defines the duty an account holder has to examine their bank statements for unauthorized activity:

> You agree that you will . . . carefully examine your bank statements [and any other enclosure(s)] for fraudulent or unauthorized transactions and promptly notify the bank of any such transaction; timely reconcile your bank statement with your internal records to detect any other account discrepancies including any missing or diverted deposits; implement security precautions regarding the use and access of your accounts through any access device including checks, drafts, other items, security codes, passwords, or confidential identification numbers; . . . independently review the work of individuals who are responsible for reconciling bank statements and preparing checks on a monthly basis; and comply with all other duties under this Agreement or under any applicable law. Your failure to exercise ordinary care will constitute negligence and will preclude you from asserting against the Bank any unauthorized transaction on your account.

BB&T Agreement 524, 546.

Regardless of how Mr. Binns reviewed his account, he did not provide prompt notification for the vast majority of the unauthorized transactions, nor did he take care to reconcile his account statements or independently review the work of the individual in his law firm responsible for doing so. During his deposition, Mr. Binns admitted that neither he, nor his bookkeeper, reconciled the account.

Therefore, his claim for transactions 215-267, which occurred after the BB&T Agreement went into effect, are barred.

### *5. Claims Already Reimbursed (Transactions 227-233, 235, and 253-267)*

Finally, the BB&T Agreement limits the bank's maximum liability for an unauthorized transaction to the amount of the transaction. *See* BB&T Agreement 525, 547. Here, the bank

14

reimbursed Mr. Binns in full for transactions 227-233, 235, and 253-267. The Agreement defines this as the BB&T's maximum liability, so any further claim is barred.

### D. Bad Faith Exception Inapplicable

Mr. Binns argues that the Banking Agreements are void and do not apply because BB&T withheld information from him and as such failed to exercise good faith. He cites *Levy Baldante Finney & Rubenstein, P.C. v. Wells Fargo Bank, N.A.*, No. 3241 EDA 2016, 2018 Pa. Super. Unpub. LEXIS 470 (Pa. Super. Ct. Feb. 14, 2018), which held that under § 4406 of the UCC, a bank may be held liable notwithstanding the terms of its agreement where there is a lack of good faith on the part of the bank. This argument fails. First, the case is non-precedential and may not be cited under the rules of the Superior Court.[11] Second, the UCC does not apply. Finally, there is no evidence in the record that BB&T withheld any information regarding the ACH transactions that form the basis of his claim.

Plaintiff relies on his own testimony regarding two conversations that a bank employee, Latifah Brooker, had with other BB&T employees and then relayed to him. As to the first conversation, Mr. Binns testified that "somebody in the 21st and Market branch told [Ms. Brooker] that since [Ms. Ives] account was overdrawn she could take money out of [Mr. Binns's] account." Binns Dep. 34:8-10. This testimony, however, is inadmissible under Federal Rule of Evidence 805 as hearsay within hearsay. Both the statements made by Ms. Brooker and by "somebody" at the other branch would have to meet a hearsay exception for Mr. Binns's testimony to be admissible. Fed. R. Evid. 805. Because the declarant of the original statement is unknown, the original statement is inadmissible, and both statements must be excluded. As such,

---

[11] Recent changes to those rules apply only to non-precedential decisions issued prospectively.

it is not a basis for defeating summary judgment. *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009).

Mr. Binns also testified that Ms. Brooker told him about a second conversation she had with another BB&T employee, Roy Thomas, as to her concern with Ms. Ives's withdrawals. Ostensibly, he told her to "mind [her] own business." Binns Dep. 33:24-34:4. Here, the statements by Ms. Brooker and Mr. Thomas would be admissible as non-hearsay because both were made by BB&T employees, while working at the bank, and concerned informing a customer about potentially suspicious withdrawals on the customer's account, which was certainly within the scope of their employment. *See* Fed. R. Evid. 801(d)(2)(D).

But this testimony fails to create a *material* dispute of fact. None of the transactions at issue in this case were made in person from a BB&T branch. The transactions were electronic ACH transfers, not in-person withdrawals. There is no question that Mr. Binns had notice of every unauthorized transaction because he admits that he received, and contemporaneously reviewed, each statement that contained a presently disputed ACH transaction. Mr. Binns has not pointed to any legal authority for the proposition that a bank employee's suspicions in an unrelated context create an affirmative duty on the part of the bank that overrides a depositor's responsibility to review his accounts.

In summary, the Banking Agreements combine to preclude Mr. Binns's claims on all 267 of the transactions. The "same wrongdoer" provisions preclude, at least, transactions 11-267, the BB&T claim notice provision precludes transactions 215-252, the BB&T limitation to file a legal claim precludes transactions 1-226, 234, and 237-252, the BB&T duty of care provision precludes transactions 215-267, and the BB&T reimbursement provision precludes transactions

227, 233, 235, 253-267. Because each transaction is precluded by one or more of the provisions in the Banking Agreements, BB&T is entitled to summary judgment.

E. UCC and EFTA Analysis

Because the controlling legal standard is not entirely free from doubt, it is worthwhile to consider whether any different result would follow under either the UCC or EFTA. It would not.

As to the UCC, Section 4406(f) prohibits recovery for unauthorized transactions if the customer fails to notify the bank within one year of the statement containing the transaction. 13 Pa. Cons. Stat. § 4406(f). Aside from the transactions identified in the affidavits, Mr. Binns did not provide notice of the other unauthorized transactions until he disclosed them during discovery on August 5, 2018. The last unauthorized transaction would have appeared in Mr. Binns March 2017 statement. Therefore, § 4406(f) precludes any claims based on transactions 1-226, 234, and 237-252, because Mr. Binns failed to submit an affidavit or otherwise provide notice prior to discovery. Furthermore, § 4406(d) contains a "same wrongdoer" defense similar to the Banking Agreements that prevents recovery of losses caused by unauthorized signatures or alterations committed by the same person if the bank is not notified within 30 days of the statement containing the transaction. 13 Pa. Cons. Stat. § 4406(d)(2). Just as with the BB&T Agreement, this would preclude claims on transactions found in any statement after March 2, 2013, which includes transactions 7-267. When combined, both UCC provisions bar claims on all 267 transactions.

EFTA's implementing regulations require customers to provide notice to their banks of any unauthorized transactions within 60 days of receiving the bank statements containing the transaction to avoid liability for subsequent transactions. 12 C.F.R. § 205.6(b)(3). If the

17

consumer fails to report within 60 days, there is no requirement that they be reimbursed for losses that could have been prevented if they had reported the unauthorized transaction. 15 U.S.C. § 1693g(a). Had Mr. Binns told BB&T of the unauthorized transactions, BB&T would undoubtedly have taken preventative measures, which was in fact what happened in March 2017 shortly after Mr. Binns submitted his affidavit. Moreover, EFTA's statute of limitations precludes claims that are filed more than one year from the occurrence of the violation, precluding recovery for transactions that occurred more than one year prior to the filing of this action (transactions 1-220). 15 U.S.C. § 1693m(g). Therefore, EFTA would similarly preclude all of the unauthorized transactions and entitle BB&T to summary judgment.

## VI. CONCLUSION

Based on the foregoing, Defendant's Motion for Summary Judgment is granted. An appropriate order follows.

/s/ Gerald Austin McHugh
United States District Judge